UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANA SMITH,

                  Plaintiff,

    v.

RICHARD ARROWOOD,

                  Defendant.

**DECISION AND ORDER**

6:21-CV-06318 EAW

---

## INTRODUCTION

Plaintiff Dana Smith ("Plaintiff" or "Smith") brings this action seeking relief under 42 U.S.C. § 1983 for violations of his Fourth Amendment rights against defendant Richard Arrowood ("Defendant" or "Arrowood"). (Dkt. 1). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 56). For the following reasons, Defendant's motion is granted.

## FACTUAL BACKGROUND

The following facts are taken from Defendant's Statement of Undisputed Facts (Dkt. 56-1), Plaintiff's Response to Defendant's Statement of Undisputed Facts (Dkt. 58-1), and the exhibits attached to the motion papers.

On May 19, 2020, Plaintiff killed a man at 30 Boardman Street in the City of Rochester, New York, for which Plaintiff eventually pled guilty to manslaughter. (Dkt. 56-1 at ¶ 1; Dkt. 58-1 at ¶ 1). Within one or two days of committing the crime leading to

- 1 -

his conviction for manslaughter, Plaintiff left Rochester and fled to Niagara Falls. (Dkt. 56-1 at ¶ 4; Dkt. 58-1 at ¶ 4).

Beginning in 2018, and at the time of the events in question, Defendant was a City of Rochester Police Department ("RPD") Officer and, as part of his job duties, he worked under the supervision and direction of the United States Marshals Service Task Force (hereinafter, the "Task Force"). (Dkt. 56-1 at ¶ 2; Dkt. 58-1 at ¶ 2). The function of the Task Force is to locate and arrest fugitives. (Dkt. 56-12 at 3 (deposition transcript of Richard Arrowood)). On June 19, 2020, Defendant was working under the supervision and direction of the Task Force. (Dkt. 56-1 at ¶ 3; Dkt. 58-1 at ¶ 3).

According to Defendant, in June 2020, he received a "WANT," from the RPD for Plaintiff. (Dkt. 56-3 at ¶ 6 (Affidavit of Richard Arrowood); *see also* Dkt. 56-4 (WANT package for Plaintiff)). A WANT is a package from a law enforcement entity—in this case, the Major Crimes Unit of the RPD—stating that an individual is wanted for arrest, pedigree information on the individual, and stating that there is probable cause to arrest and charge that individual. (Dkt. 56-3 at ¶ 7). The WANT package stated the following about Plaintiff: he was wanted for murder in the second degree, for the murder of a 57 year old man by beating him with a hammer and stabbing him over 20 times; he was known to resist arrest; he had a history of violent behavior; he had a criminal history in Niagara Falls; he was in possession of a knife; and to use caution when dealing with him. (*Id*. at ¶¶ 8-9). Defendant gave the WANT package to his Task Force supervisor on June 19, 2020. (*Id*. at ¶ 10). The Task Force had been in Niagara Falls for several days before June 19, 2020,

as they had received leads that Plaintiff may have fled there following the murder on May 19, 2020.  (*Id*. at ¶ 11).

On June 19, 2020, the Task Force had information that Plaintiff was in Niagara Falls and may have been staying at an apartment located at 1755 Falls Street.  (Dkt. 56-1 at ¶ 5; Dkt. 58-1 at ¶ 5).  According to Defendant, on June 19, 2020, he and the Task Force spotted a man come out of the bushes around 1755 Falls Street, come down Falls Street, and then return to the same bushes.  (Dkt. 56-1 at ¶¶ 6-7).  Defendant observed that the man matched the picture and identity of Plaintiff.  (Dkt. 56-3 at ¶ 13).  The Task Force was ordered to surround 1755 Falls Street.  (Dkt. 56-1 at ¶¶ 8-9; Dkt. 58-1 at ¶¶ 8-9).  The building was immediately surrounded, and another Task Force member, Charles Carroll, approached the open porch of the house.  (Dkt. 56-1 at ¶¶ 8-9; Dkt. 58-1 at ¶¶ 8-9).

Defendant contends that Plaintiff came out onto the open front porch and looked to the right down the street, in the direction he came from before ducking into the bushes. (Dkt. 56-1 at ¶ 10).  Defendant wanted to arrest Plaintiff for the May 19 murder charge, and stated to Plaintiff, "Hey man, I need to talk to you."  (Dkt. 56-1 at ¶ 11).  According to Defendant, Plaintiff turned and attempted to run in the house and close the door.  (*Id*. at ¶ 12).  Defendant and Carroll chased Plaintiff, kicked the door to prevent it from closing, and pursued Plaintiff into the house.  (*Id*.).  Defendant and Carroll sought to place Plaintiff into custody and they observed his right hand buried in his pants.  (*Id*. at ¶ 13).  Plaintiff ran toward the back of the house, and Defendant and Carroll pursued Plaintiff into the far back room.  (*Id*. at ¶¶ 14-15).  Carroll was sitting and trying to grasp Plaintiff with two hands, and Plaintiff was squatting directly facing Defendant and Carroll.  (*Id*. at ¶ 16).

- 3 -

Defendant was to Carroll's right. (*Id.*). Carroll yelled "knife," and Arrowood saw a knife blade sticking out of Smith's right hand. (*Id.* at ¶ 17). Carroll yelled to Plaintiff, "Drop the knife! Drop the knife!" (Dkt. 56-5 at 2 (sworn statement by Charles Carroll)). Plaintiff, Carroll, and Defendant struggled in the small back room, they were all touching each other, and Defendant saw Plaintiff holding the knife less than six inches from himself and Carroll. (Dkt. 56-1 at ¶ 18). Defendant stated that he had no time for any other use of force due to the closeness of the blade to him and his partner, so he used his service weapon and shot Plaintiff twice in the left shoulder area. (Dkt. 56-3 at ¶ 27). Plaintiff was shot and fell to the ground and dropped the knife. (Dkt. 56-1 at ¶ 19). Carroll and Plaintiff continued to struggle on the ground, where Smith again grabbed the knife. (*Id.*). Carroll regained control of the knife and threw it out the back window. (*Id.*). Other Task Force members opened the back door and gained control of Plaintiff by pulling him out of the house. (*Id.* at ¶ 20). When Plaintiff was being removed from the house, he continued to struggle and bit Carroll in the thigh. (*Id.*). Plaintiff was arrested by the Task Force. (*Id.* at ¶ 21).

Plaintiff contests that Defendant had probable cause to arrest him, since there was no warrant for his arrest—only a WANT package, which permitted that Plaintiff be brought in for questioning as a person of interest. (Dkt. 58-1 at ¶ 11). According to Plaintiff, he went through the front door of 1755 Falls Street and closed it, and Defendant and Carroll forced the door open and entered the apartment. (*Id.* at ¶ 12). Plaintiff maintains that Defendant and Carroll attempted to subdue him while each of them had a gun in their hand. (*Id.* at ¶ 14). Plaintiff does not dispute that Carroll yelled "knife," but denies that he had a knife sticking out of his right hand. (*Id.* at ¶ 17). Plaintiff maintains that Defendant shot

Plaintiff twice in the back, at close range.  (*Id*. at ¶ 19).  Plaintiff states that he was removed from the apartment and transported by ambulance to the Erie County Medical Center and was under guard by RPD investigators.  (*Id*. at ¶ 21).  Plaintiff was transported to the Monroe County Jail, arrested, and charged by the RPD on or about July 1, 2020.  (*Id*.).

## PROCEDURAL HISTORY

Plaintiff commenced the instant action on April 14, 2021, seeking relief under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971), for violations of his Fourth Amendment and Fourteenth Amendment rights and other state law claims against defendants Richard Arrowood, Charles Carroll, Charles Salina, Christopher DeVinney, Matthew Young, Jason Hendel, Adam Harden, Scott Baryza, James Bona, Carl Smith, and Timothy Carney.  (Dkt. 1).

Thereafter, on November 8, 2021, the Federal Defendants (Scott Baryza, James Bona, Timothy Carney, Charles Carroll, Christopher Devinny, Charles Salina, and Carl Smith) filed a motion to substitute the United States as a party and to dismiss (Dkt. 15), and the County Defendants (Jason Hendel and Matthew Young) filed a motion to dismiss (Dkt. 17).  On November 22, 2021, the City Defendants (Richard Arrowood and Adam Harden) filed a motion to dismiss.  (Dkt. 20).

On August 31, 2022, the Court granted the Federal Defendants' motion to substitute and granted in part and denied in part their motion to dismiss, granted the County Defendants' motion to dismiss, granted in part and denied in part the City Defendants' motion to dismiss, and granted Plaintiff leave to file a proposed amended complaint as against defendants Arrowood, Carroll, and DeVinney.  (Dkt. 33).  Plaintiff filed an

amended complaint against Arrowood, Carroll, and DeVinney on September 19, 2022.
(Dkt. 34).  Defendant filed an answer on October 17, 2022.  (Dkt. 41).  Defendants Carroll
and DeVinney filed a motion to dismiss the amended complaint on October 11, 2022 (Dkt.
39), which the Court granted on September 18, 2023 (Dkt. 45).  The case was referred to
the Hon. Mark W. Pedersen, United States Magistrate Judge, for supervision of discovery.
(Dkt. 46).

Defendant filed his motion for summary judgment on May 30, 2025.  (Dkt. 56).  In
support of his motion for summary judgment, Defendant has submitted various exhibits,
including deposition transcripts, as well as his own sworn statements and sworn statements
from other officers and individuals at the scene on June 19, 2020.  (*See* Dkt. 56-3 through
Dkt. 56-12).  Plaintiff filed a response on June 27, 2025, submitting only his response to
Defendant's statement of undisputed facts and a memorandum of law.  (*See* Dkt. 58).  In
other words, Plaintiff has failed to submit any admissible evidence in opposition to the
pending motion.

## DISCUSSION

### I.    Legal Standards

#### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment
should be granted if the moving party establishes "that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  The Court should grant summary judgment if, after considering the evidence in
the light most favorable to the non-moving party, the Court finds that no rational jury could

find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concerta Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation modified). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B.    Section 1983

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).  A plaintiff "must demonstrate that the challenged conduct was 'committed by a person acting under color of state law,' and 'deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Jie Yin v. NFTA*, 188 F. Supp. 3d 259, 268-69 (W.D.N.Y. 2016) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). But a plaintiff cannot rely on a *respondeat superior* theory of liability, *see Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), and "must directly plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution,'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

## II.    Analysis

### A.  Unlawful Arrest Claim

Defendant argues that he is entitled to summary judgment on Plaintiff's unlawful arrest claim because the WANT package gave him probable cause to arrest Plaintiff, and because Plaintiff's arrest arose from exigent circumstances, and therefore he was not required to obtain a warrant to enter 1755 Falls Street or to arrest Plaintiff.  (Dkt. 56-13 at 3-9).  In response, Plaintiff argues that Defendant did not have a warrant to arrest him, that there was sufficient time to secure an arrest warrant, and that Defendant was not in "hot pursuit" of Plaintiff.  (Dkt. 58-2 at 4).

"In analyzing § 1983 claims for unconstitutional arrest, [courts] generally look[ ] to the law of the state in which the arrest occurred." *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). In New York, a plaintiff asserting a claim for false arrest must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks, alterations, and citation omitted). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Boans v. Town of Cheektowaga*, 5 F. Supp. 3d 364, 384 (W.D.N.Y. 2014) (citation modified).

Defendant does not dispute that he intended to confine Plaintiff, that Plaintiff was conscious of the confinement, and that Plaintiff did not consent to the confinement. Rather, the dispute between the parties centers on whether Defendant's arrest of Plaintiff was "otherwise privileged." Specifically, Defendant argues that he was permitted to arrest Plaintiff because the WANT package gave him probable cause to arrest Plaintiff for murder, and Plaintiff's flight from officers on June 19, 2020 created exigent circumstances. (*See* Dkt. 56-13 at 3).

The Court turns first to the issue of whether the WANT package gave Defendant probable cause to arrest Plaintiff. "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be

- 9 -

arrested." *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995); *see also United States v. Cole*, 26 F. App'x 45, 46-47 (2d Cir. 2001) (same). "The facts and circumstances from which an officer may infer probable cause need not reach the level of evidence necessary to support a conviction, but they must be more than rumor, suspicion, or even a strong reason to suspect." *Id*. at 47 (citation modified). Further, "[a]n officer may draw inferences based on his own experience in deciding whether probable cause exists." *Id*.

Defendant has submitted the WANT package as Exhibit B to his motion for summary judgment. (*See* Dkt. 56-4). The package is 16 pages long, and states on the first page:

> Dana Smith is currently WANTED by RPDs MCU for Murder-2nd in relation to the homicide at 30 Boardman St on 5/19/2020 (ROC 20-102663). Smith is known to resist arrest and has a history of violent behavior. Dana Smith has a criminal history out of Niagara Falls and additional addresses in Florida.

(*Id*. at 1). The WANT package further provides on the first page, in red lettering, "Officer Safety: Smith may be in possession of a knife. Use caution when dealing with Smith." (*Id*.). The WANT package also provides a photograph and identifying information for Plaintiff, as well as information on his criminal history and his whereabouts. Defendant testified at his deposition that he was briefed on the WANT package at the Public Safety Building by investigators from the Major Crimes Unit. (Dkt. 56-12 at 3-4).

Defendant spoke with the investigators about Plaintiff, including that Plaintiff was wanted for murder, and Defendant was provided with information about the crime. (*Id*.). The RPD asked Defendant, as a member of the Task Force, to arrest Plaintiff. (*Id*. at 4). Thereafter, on June 19, 2020, after receiving this information about Plaintiff and also

receiving information that Plaintiff was in Niagara Falls, Defendant traveled to Niagara Falls with the Task Force, and observed an individual he believed to be Plaintiff at 1755 Falls Street.  (*Id*. at 5-6).  The individual came out from between 1755 Falls Street and another house, went down the street, and after several minutes Defendant saw Plaintiff jogging back down the street, past Defendant, and went toward the back of 1755 Falls Street.  (*Id*. at 6).  Defendant radioed that information to the other officers and they surrounded 1755 Falls Street.  (*Id*.).  Defendant approached the house and heard the front door open, and observed Plaintiff on the front porch. (*Id*.).  Defendant spoke to Plaintiff, and said "Hey, buddy.  I need to talk to you."  (*Id*.; *see also* Dkt. 56-7 (sworn statement by Richard Arrowood)).  Plaintiff does not dispute that he pleaded guilty to manslaughter in connection with the crime for which he was arrested.  (Dkt. 56-1 at ¶ 1; Dkt. 58-1 at ¶ 1).

Plaintiff fails to submit any evidence in opposition to Defendant's recounting of events, such as his own declaration disputing that he was the individual referred to in the WANT package, disputing any other information in the WANT package, disputing that he was in Niagara Falls in June 2020, or disputing that he was the individual the officers identified on June 19, 2020.  Rather, Plaintiff admitted at his deposition that he moved to Niagara Falls after killing a man at 30 Boardman Street in Rochester, for which he eventually pled guilty to manslaughter, and that he went to 1755 Falls Street in Niagara Falls. (Dkt. 56-11 at 6-8, 11).  Given the information contained in the WANT package and the briefing Defendant received from the RPD, coupled with Defendant's identification and observations of Plaintiff at and around 1755 Falls Street, the Court concludes that Defendant had knowledge or reasonably trustworthy information, sufficient to warrant his

belief that the person to be arrested—Plaintiff—committed an offense. *Lennon*, 66 F.3d at 424.

The Court turns next to the issue of exigency. Plaintiff argues that Defendant lacked a warrant to enter 1755 Falls Street and to effectuate the arrest. (Dkt. 58-2 at 3-4). To that end, it is well-settled that "[t]he issuance of a warrant by a judicial officer upon a finding of probable cause creates a presumption that the officer's action in executing the warrant was reasonable." *Selvam v. United States*, 570 F. Supp. 3d 29, 40 (E.D.N.Y. 2021), *aff'd*, 2022 WL 6589550 (2d Cir. 2022); *see also May v. Levy*, 659 F. Supp. 3d 323, 336 (E.D.N.Y. 2023) (arrest effectuated pursuant to a warrant issued by a neutral magistrate and an indictment creates a presumption of probable cause, which is a complete defense to a claim for unlawful arrest). The second page of the WANT package is a print-out from the "eJusticeNY Integrated Justice Portal," and states "Status of Warrant: Issued – a warrant has been signed by an empowered authority." (Dkt. 56-4 at 2). However, there is no arrest warrant or charging instrument included as part of the WANT package, nor has Defendant provided a copy of an arrest warrant in connection with his motion.

"It is well established that 'the Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *United States v. Zuber*, 899 F. Supp. 188, 193 (D. Vt. 1995) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990)). "The rule prohibiting warrantless entries into the home applies even if there is probable cause to arrest the suspect," and accordingly, "when government authorities enter a person's home, the warrant requirement imposed by the Fourth Amendment will only yield when 'exigent circumstances require law enforcement

officers to act without delay.'" *Id.* (quoting *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)); *see also Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014) ("police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home" (citation omitted)). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Id.* at 233-34 (citation omitted).

"The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case." *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 139 (D. Conn. 2004). The factors to be considered by the district court include:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990).

In his opposition papers, Plaintiff suggests that he had a privacy interest in the 1755 Falls Street residence. (*See, e.g.*, Dkt. 58-2 at 3-4 (noting that the officers made entry into a private residence, and there was time to secure a warrant for the residence Plaintiff occupied)). Plaintiff fails to meaningfully explain why he had a privacy interest in 1755 Falls Street, but the Court has considered Plaintiff's deposition testimony on the subject. At his deposition, Plaintiff testified that about one to two days after committing the crime

in Rochester, he went to Niagara Falls.  (Dkt. 56-11 at 8).  Plaintiff's niece encouraged him to come back to Niagara Falls, because "if the police [were] going to get you, they're going to get you.  They're going to arrest you."  (*Id*. at 9).  Plaintiff testified that when he returned to Niagara Falls, he stayed in different locations, including that he first stayed at 1755 Falls Street, then he went to his niece's house on 9th Street in Niagara Falls, and then he returned to 1755 Falls Street.  (*Id*. at 10-11).  Plaintiff spent "a couple of days" at 1755 Falls Street before he was arrested.  (*Id*. at 11).  Plaintiff testified that he planned to make 1755 Falls Street his residence, but he was arrested before he could pay any money to lease it.  (*Id*. at 12-13).  For the following reasons, even giving Plaintiff the benefit of the doubt and finding that he had a privacy interest in the 1755 Falls Street residence, the Court concludes that his unlawful arrest claim fails.

Defendant argues that the warrant requirement should be excused because of exigent circumstances—specifically, because the officers were in "hot pursuit" of Plaintiff.  Defendant and other officers had been searching for Plaintiff since May 19, 2020.  (Dkt. 56-12 at 4-5).  When Defendant finally positively identified Plaintiff and attempted to speak to him, Plaintiff fled from the officers.  Specifically, Defendant testified that when he approached Plaintiff and spoke to him, Plaintiff "turned around and ran into the house." (*Id*. at 7; *see also* Dkt.  56-5 at 1 (sworn statement by Charles Carroll, that Plaintiff ran in the front door of 1755 Falls Street and the officers chased after him inside)).  Defendant was wearing a blue vest, with large block letters that said "police" on the front and on the back.  (Dkt. 56-12 at 7-8).  Plaintiff attempted to close the front door, but Defendant kicked it open.  (*Id*. at 7).  Defendant entered the house and saw Plaintiff hiding behind the door.

(*Id*. at 8).  Defendant attempted to pull Plaintiff to the ground, but Plaintiff broke away from Defendant and Carroll and ran towards the back of the house.  (*Id*.).  Defendant and Carroll ran after Plaintiff towards the back room, where Defendant was pushed off balance and up against the back wall, and a struggle ensued.  (*Id*. at 9).

Defendant further offers the sworn statement of Michelle Guedesse, a woman living at 1755 Falls Street, who stated that Plaintiff "burst through the back door running towards the front of the house," and that he was "yelling something about cops," and that he was attempting to escape from the police.  (*See* Dkt. 56-9).  Ms. Guedesse further stated that she lived at 1755 Falls Street with an individual named Jamie, that Plaintiff was Jamie's friend and approximately two days before June 19, 2020, Plaintiff came over, that she had a false name for Plaintiff, and that after Plaintiff's arrest, Jamie told her that Plaintiff's "actual name is Dana."  (*Id*.).

Plaintiff testified that he did not want anyone to know that he was in Niagara Falls, and that on his way back from the store on June 19, 2020, he saw "a lot of different faces, some people out there," and that he "figured somebody [was] looking for me, somebody [was] going to tell on me."  (Dkt. 56-11 at 17, 19).  Plaintiff testified that he was in 1755 Falls Street and heard a "boom, boom, boom," and that he ran up three stairs to the door. (*Id*. at 20).  Plaintiff looked out the door and heard someone in the bushes, but Plaintiff did not respond because he did not know who it was, and he went back into the house.  (*Id*.).

Considering the *MacDonald* factors with the undisputed facts, the Court concludes that no reasonable jury could find an absence of exigent circumstances.  With respect to the first three factors, it is undisputed that, at the time of his arrest, Plaintiff was wanted for

the violent crime of murder in the second degree. *See Loria v. Gorman*, 306 F.3d 1271,1285 (2d Cir. 2002) (explaining that "[t]he first factor—the gravity or violent nature of the offense—weighs heavily in the determination of whether exigent circumstances exist"). Defendant had been briefed on the WANT package and on the crime committed by Plaintiff, and the information possessed by Defendant was that Plaintiff would likely be armed with a knife, and that he posed a threat to officer safety. Plaintiff does not meaningfully dispute these facts.

With respect to the latter three factors, it is undisputed that Defendant observed Plaintiff enter the property at 1755 Falls Street, and Plaintiff appeared to be attempting to evade law enforcement. Law enforcement had been searching for Plaintiff since May 19, 2020. Plaintiff admitted at his deposition that he "didn't want to get too many people knowing that [he] was in Niagara Falls," and he was suspicious that the police were searching for him, including on June 19, 2020, when he left the store to return to 1755 Falls Street. (Dkt. 56-11 at 17-19). When Defendant attempted to speak to Plaintiff, Plaintiff fled into 1755 Falls Street, and then led Defendant and Carroll on a chase through the residence. *See United States v. Mendoza*, 406 F. App'x 513, 516 (2d Cir. 2011) (affirming district court's finding that exigent circumstances existed, considering that "[t]he agents knew [defendant] had reentered his home because they saw him do so and observed him directly through the glass of the front door," and also "[defendant's] flight at the sight of law enforcement"); *see also United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016) (explaining that exigent circumstances exist to pursue a fleeing suspect); *see also United States v. Andino*, 768 F.3d 94, 101 (2d Cir. 2014) (rejecting argument that the officers did

not have authority to be at the defendant's premises after she refused them entry by shutting the door, and discussing caselaw supporting that a warrantless entry can be justified by the suspect's reaction to seeing an officer at the door). Accordingly, the *MacDonald* factors weigh in favor of a finding of exigency.

Given the evidence before the Court of Plaintiff's claim for unlawful arrest—again, which is largely undisputed by Plaintiff, who has not submitted any evidence in opposition to Defendant's motion—the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claim for unlawful arrest.

### B.  Excessive Force Claim

Defendant next argues that he is entitled to summary judgment on Plaintiff's excessive force claim because Plaintiff fails to establish that excessive force was used, and the WANT package demonstrated that the officers were authorized to use some degree of force or the threat thereof, to effectuate Plaintiff's arrest. (Dkt. 56-13 at 9-11). In response, Plaintiff argues that "the sufficiency of the complaint has already been addressed by this court," that "Defendant merely concludes that he had probable cause to enter and subdue the Plaintiff without asserting any facts to support this claim," and that Defendant "seeks to use the Plaintiff's subsequent plea of guilty to supplant the need for probable cause." (Dkt. 58-2 at 5).

Claims that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 388 (1989). "The pertinent inquiry is 'whether the officers' actions are objectively

reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Paul v. City of Rochester,* 452 F. Supp. 2d 223, 226 (W.D.N.Y. 2006) (quoting *Graham*, 490 U.S. at 397). "Moreover, the Court must make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Smith v. Sawyer*, 435 F. Supp. 3d 417, 433 (N.D.N.Y. 2020) (quotations and citations omitted), *reconsideration denied*, 2020 WL 1493911 (N.D.N.Y. Mar. 27, 2020).

"To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment." *Barnes v. Felix*, 605 U.S. 73, 76 (2025). An evaluation of the reasonableness of an officer's actions should consider "all the facts of the case, including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest." *Carey v. Maloney,* 480 F. Supp. 2d 548, 556 (D. Conn. 2007); *see also Santana v. City of Hartford*, 283 F. Supp. 2d 720, 726 (D. Conn. 2003) (explaining that reasonableness involves the following considerations: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight"). In cases involving "whether an officer used excessive force in self-defense, the 'immediate threat' criterion controls the court's evaluation." *Id*. (quoting *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996)). "If the suspect threatens the officer with

a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. (citation omitted).

In support of his argument that the force used was not excessive, Defendant submits his deposition testimony (Dkt. 56-12), his own sworn statements (Dkt. 56-3 & Dkt. 56-7), and various other sworn statements, including statements by Ms. Guedesse (Dkt. 56-9), Carroll (Dkt. 56-5), Christian DeVinney (Dkt. 56-8), and Matthew Young (Dkt. 56-6). Defendant testified that when he entered 1755 Falls Street, he saw Plaintiff hiding behind the door.  (Dkt. 56-12 at 8).  Plaintiff was not displaying a weapon but Defendant had his weapon out when he was addressing Plaintiff.  (*Id*.).  Defendant ordered Plaintiff to show his hands, but Plaintiff did not comply and had his right hand down his pants.  (*Id*.).  Defendant thought he heard Plaintiff say, "I have a gun."  (*Id*.).  Defendant used his left hand to pull Plaintiff to the ground, but Plaintiff broke away and ran toward the back of the house.  (*Id*.).  Defendant and Carroll ran after Plaintiff.  (*Id*. at 9).  When Defendant reached Plaintiff, Plaintiff turned around toward Defendant, and Defendant hit Plaintiff in the face. (*Id*.).  Plaintiff pushed Defendant into the back room, off-balance, up against the back wall. (*Id*.).  Defendant testified that he was standing almost over Plaintiff.  (*Id*.).  Plaintiff was in a squatting position, and Carroll was to Defendant's left.  (*Id*.).  Both Defendant and Carroll struggled with Plaintiff, and Defendant heard Carroll yell, "knife."  (*Id*.).  Defendant saw the blade sticking out of Plaintiff's right hand.  (*Id*.).  Ms. Guedesse testified that she heard the officers warn Plaintiff before Defendant discharged his firearm.  (*See* Dkt. 56-9 ("I heard the officers yelling 'I'm gonna shoot, I'm gonna shoot' then I heard two gun shots")).

Carroll also testified that he ordered Plaintiff, "Drop the knife! Drop the knife!"  (Dkt. 56-5 at 2).

Defendant testified that the knife was near Carroll, since the room was very small and the three men barely fit in it.  (Dkt. 56-12 at 9).  Carroll was crouched down, and due to his being in a vulnerable position and their inability to get the knife away from Plaintiff, Defendant feared for his own safety and for Carroll's safety.  (Dkt. 56-7 at 1).  Defendant shot Plaintiff twice, and the rounds impacted Plaintiff in his left shoulder area, after which Plaintiff fell to the floor.  (Dkt. 56-12 at 10).  Plaintiff bit Carroll, after which Defendant held Plaintiff down while Carroll opened the door.  (*Id*.).  Once the door was opened, another officer pulled Plaintiff out into the backyard, and they began administering medical treatment to Plaintiff.  (*Id*. at 11).  Defendant observed Plaintiff bleeding due to the bullet wound.  (*Id*.).  Plaintiff was transported to the hospital.  (*Id*.; *see also* Dkt. 56-7).  Defendant later asked where the knife was, and one of the officers pointed to where it was, outside the back of the house.  (Dkt. 56-7 at 2).

Carroll testified that upon entering 1755 Falls Street, he found Plaintiff hiding behind the door.  (Dkt. 56-5).  He observed Plaintiff reach down the front of his pants towards his groin area, and pull out a silver stainless steel knife, with a sharp pointy end.  (*Id*.).  Plaintiff refused to drop the knife when directed to do so, and he was "moving his hands and the knife all over the place."  (*Id*.).  Carroll was "in fear for [his] life and my other team member."  (*Id*.).  When Carroll gained control of the knife, he threw it out the window.  (*Id*.).

Plaintiff submits no evidence in opposition to Defendant's motion—such as his own sworn statement as to the events of June 19, 2020—and he only references his deposition testimony submitted by Defendant in an attempt to defeat the pending motion.  According to Plaintiff, on June 19, 2020, Defendant "kicked the door in and shot [him]."  (Dkt. 56-11 at 11).  Plaintiff testified that he woke up late that day, walked to the store to buy beer and a cigarette, and that as he walked back to 1755 Falls Street, he "saw a lot of different faces," and that he "figured somebody was looking for [him]," but he did not see any police cars. (*Id*. at 17-19).  Plaintiff stated that Jamie, an individual living at 1755 Falls Street, told him there was a man outside with a gun running down the alley.  (*Id*. at 19).  Plaintiff testified that he saw the man run right by him.  (*Id*.).  Plaintiff went in the house and to the front door, where he saw another man running down the street.  (*Id*. at 19-20).  Plaintiff went in the house and heard a "boom, boom, boom," ran up three stairs, and looked out the door. (*Id*. at 20).  Plaintiff looked out the door and heard someone in the bushes, but Plaintiff did not respond because he did not know who it was.  (*Id*.).  Plaintiff testified that an officer kicked the door in, he tussled with the man, and then he remembered hearing a gunshot, after which he was out in the yard on the ground.  (*Id*.).  Plaintiff testified that he did not have any weapon, including a knife or a gun.  (*Id*. at 21).

Plaintiff has failed to raise a genuine dispute of material fact with respect to the excessive force claim.  Plaintiff does not dispute that Defendant was in possession of information that he was violent and wanted for second degree murder.  Nor does Plaintiff dispute that he ran from the officers or that he fought the officers attempting to arrest him. Further, Plaintiff does not dispute that Defendants had information that Plaintiff was known

to carry a knife, or that Carroll yelled "knife" during the scuffle.  (*See* Dkt. 58-1 at ¶¶ 17-18).

At his deposition, Plaintiff testified that he "had no knife,"[1] but that conclusory statement is heavily contradicted by other evidence in the record, including sworn statements by several individuals indicating that Plaintiff did have a knife.  (*See, e.g.*, Dkt. 56-3 (Defendant's affidavit); Dkt. 56-7 (Defendant's sworn statement); Dkt. 56-5 (Carroll sworn statement); *see also* Dkt. 56-6 (sworn statement of Task Force Officer Matthew Young, who followed Defendant and Carroll into 1755 Falls Street, observed Defendant and Carroll struggling with Plaintiff, and saw Plaintiff holding "a medium sized silver knife," and heard Carroll screaming "he's got a knife"); Dkt. 56-8 (sworn statement of Task Force Officer Christian DeVinney, who upon arrival at 1755 Falls Street, saw Carroll in a small enclosed area appearing to struggle with Plaintiff, and noting that he heard Carroll make reference to a knife, and then saw him drop a silver knife out the window where the officers were standing)).

Plaintiff has failed to submit any evidence in opposition to Defendant's motion.  (*See* Dkt. 58).  Plaintiff's argument that "the sufficiency of the complaint has already been addressed by this court" is misplaced, since on a motion for summary judgment, a plaintiff cannot merely rely on the allegations in the complaint.  *See* Fed. R. Civ. P. 56 (providing that a plaintiff may not oppose summary judgment simply by relying upon the allegations

---

[1]    When Plaintiff was shown a photograph of the knife at his deposition and asked if he was in possession of it, Plaintiff responded that his fingerprints and DNA were not found on it—but the portion of the deposition transcript before the Court does not indicate that Plaintiff outright denied possessing the knife in the photograph.  (*See* Dkt. 65-11 at 21).

in the complaint). Plaintiff could have disputed his possession of the knife or otherwise explained the presence of the knife at the scene by submitting his own affidavit, but he failed to do so. Plaintiff also could have submitted sworn statements by other individuals calling his possession of a knife into question, but he did not. Considering the voluminous evidence submitted by Defendant—all of which is consistent with respect to Plaintiff's possession of a knife—and the absence of *any* evidence submitted by Plaintiff, Plaintiff's conclusory, self-serving statement is not sufficient to defeat summary judgment. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 554-55 (2d Cir. 2005); *Adler v. Penn Credit Corp.*, No. 19-CV-7084 (KMK), 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) ("a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment" (quotations, citations, and alteration omitted) (collecting cases)); *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (same), *aff'd*, 739 F. App'x 72 (2d Cir. 2018).

Considering the severity of the crime at issue, whether Plaintiff posed an immediate threat to the safety of the officers or others, and whether Plaintiff was actively resisting arrest or attempting to evade arrest, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's excessive force claim. The evidence before the Court demonstrates that Defendant was aware that Plaintiff was a violent offender wanted for second degree murder and could be carrying a knife. Plaintiff attempted to evade arrest, refused to comply with Defendant's instructions, resisted arrest, and fought Defendant and another officer with a knife in close quarters.

The evidence before the Court further demonstrates that Defendant reasonably perceived an immediate threat to himself and Deputy Carroll (*see, e.g.*, Dkt. 56-3 at ¶ 27 ("Smith was holding the knife less than 6 inches from Carroll and myself in that small area. I had no time . . . for any other use of force due to the closeness of the blade to my partner and myself. . . ."); Dkt. 56-5 ("At this point, I was in fear for my life and my other team member.  I'm hanging on for dear life, hoping he drops it.")), and Plaintiff was warned to drop the knife and that the officers would shoot if Plaintiff failed to comply.  When Plaintiff failed to comply and the officers could not get the knife away from Plaintiff, Defendant discharged two rounds into Plaintiff's left shoulder, after which Plaintiff received immediate medical treatment.  Given these undisputed facts, no reasonable jury could conclude that Defendant used more force than was necessary. *See Strong v. Gorman*, 310 F. Supp. 3d 380, 383 (W.D.N.Y. 2018) (granting summary judgment in favor of officers, where the plaintiff, while unarmed at the time he was shot, was a murder suspect, led police on a high-speed chase through the streets of Rochester, had fired at and hit a police officer, continued to flee after he was hit by bullets, and then refused to surrender when cornered); *Santana,* 283 F. Supp. 2d at 727 (granting summary judgment in favor of officer who discharged his firearm, where the evidence was that the arrestee was "really going crazy" and wearing a 8.5" army knife, refused to comply with the officer's directions that he put down the knife, attempted to leave the premises, and then charged with the knife, since the officer had a reasonable apprehension of an immediate safety threat); *Garcia v. Grisanti*, 998 F. Supp. 270, 273 (W.D.N.Y. 1998) (granting summary judgment in favor of officer who discharged a firearm and injured the plaintiff's hand, where the plaintiff actively

resisted arrest by grabbing a shotgun and attempting to strike the defendant with a steam iron, since the plaintiff posed an immediate threat to the safety of the officers); *see also Henry-Lee v. City of N.Y.*, 746 F. Supp. 2d 546, 561 (S.D.N.Y. 2010) ("A stabbing constitutes deadly force, and therefore [the officer's] shooting of [the plaintiff] would not be excessive if it was performed to prevent such deadly force.").

For those reasons, the Court concludes that Plaintiff has failed to show a genuine dispute as to any material fact with respect to the excessive force claim, and Defendant is entitled to summary judgment on this issue. But even if that conclusion was incorrect, it is clear that Defendant is entitled to qualified immunity.

### C. Qualified Immunity

Defendant lastly argues that he is entitled to qualified immunity on Plaintiff's claims, because at the time of the challenged arrest and use of force, it was objectively reasonable for him to believe that his behavior did not violate Plaintiff's clearly established rights, including because Defendant believed that Plaintiff was wanted for murder. (Dkt. 56-13 at 11-13). Plaintiff responds that Defendant "is alleged to have violated some of the most established constitutional guarantees in law," and that Defendant's actions were patently unreasonable. (Dkt. 58-2 at 6).

"Any claim for damages against officials in their individual capacities . . . implicates the doctrine of qualified immunity." *Tanvir v. Tanzin*, 120 F.4th 1049, 1059 (2d Cir. 2024) (citation modified). "That doctrine 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *see Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (explaining that "[q]ualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." (citation modified)).

"In deciding whether an official is entitled to qualified immunity, [a court] conducts a two-pronged inquiry, asking whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (citation modified). "The Supreme Court has left it up to courts to decide the order in which to approach those questions." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Ultimately, however, "qualified immunity is defeated only if *both* requirements are met." *Nat'l Rifle Assoc. of Am. v. Vullo*, 144 F.4th 376, 389 (2d Cir. 2025). When properly applied, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Matusak v. Daminski*, 165 F.4th 702, 711 (2d Cir. 2026) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation marks and citation omitted).

The Court concludes that Defendant is entitled to qualified immunity as to both Plaintiff's unlawful arrest and excessive force claims. With respect to Plaintiff's claim for unlawful arrest, qualified immunity shields officers from liability under § 1983 so long as "arguable probable cause" existed. *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). Arguable probable cause exists if either "it was objectively reasonable for the officer to believe that probable cause

existed," or "officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 633 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). At the time of the challenged arrest, it was objectively reasonable for Defendant to believe that his actions did not violate Plaintiff's clearly established rights. Plaintiff does not dispute that he was wanted for murder in the second degree, that Defendant possessed information that Plaintiff was violent and could be carrying a knife, that Defendant identified Plaintiff and saw him enter 1755 Falls Street, that Plaintiff was attempting to evade arrest, or that Plaintiff fled from officers. Under the circumstances, it was reasonable for Defendant to believe that he had arguable probable cause to arrest Plaintiff.

As to the excessive force claim, Plaintiff does not dispute that on June 19, 2020, he was wanted for murder in the second degree, that Defendant possessed information that Plaintiff was violent and could be carrying a knife, that he was attempting to evade arrest, or that he fled from officers and resisted arrest. Other than Plaintiff's conclusory statement that he did not have a knife, Plaintiff has offered no evidence disputing that Defendant reasonably perceived an immediate threat to himself and Carroll when he discharged two rounds into Plaintiff's left shoulder. *See Strong*, 310 F. Supp. 3d at 383-84 (defendants entitled to qualified immunity on excessive force claim, explaining, "[j]ust weeks ago, the Supreme Court of the United States held that a police officer was entitled to qualified immunity where the officer shot a woman who was wielding a large knife and who refused commands to drop the knife" (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)). Under the circumstances, the undisputed facts establish that it was reasonable for Defendant to

believe that he was justified in shooting Plaintiff in the shoulder. Based on the record before the Court, it would not have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," even if Defendant was ultimately mistaken concerning Plaintiff's possession of a knife. *Matusak*, 165 F.4th at 712 (citations omitted). Plaintiff has failed to raise a legitimate opposition to Defendant's qualified immunity claim. Accordingly, Defendant is entitled to qualified immunity on Plaintiff's claims for unlawful arrest and excessive force.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment (Dkt. 56) is granted. The Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      March 13, 2026
            Rochester, New York